**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | No. 2:16-cv-0797-DCN |
| vs. | ) ) | **ORDER** |
| MOONSHINE SALOON, LLC, and ROY W. INFINGER, JR., as Personal Representative of the Estate of APRIL INFINGER, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

The instant matters are before the court on plaintiff Scottsdale Insurance Company ("Scottsdale") and defendant Roy W. Infinger, Jr.'s ("Infinger") cross motions for summary judgment. For the following reasons the court grants Scottsdale's motion for summary judgment, and denies Infinger's motion for summary judgment.

## I.  BACKGROUND

On the night of December 8, 2013, decedent April Infinger ("decedent"), and her husband, Wayne Infinger ("Wayne"), attended a concert at the Moonshine Saloon (the "Saloon"), a bar and grill operated by defendant Moonshine Saloon, LLC ("Moonshine LLC"). ECF No. 1, Ex. B, Underlying Compl. ¶¶ 6–8. The Saloon was crowded that night and a number of Moonshine LLC's security personnel were present. Id. ¶ 8. At some point, another patron, Shearon Bennett ("Bennett"), became involved in an altercation and was asked to leave. Id. ¶¶ 9, 10. Though the nature of this altercation and Bennett's subsequent actions are the subject of some dispute, it is

1

undisputed that Bennett eventually discharged a firearm in the Saloon's parking lot, and that one round from the firearm penetrated a wall of the Saloon and struck decedent in the back.  Id. ¶¶ 11, 12.  Decedent later died from the injuries she sustained in the shooting.  Id. ¶ 13.

At the time of the shooting, Moonshine LLC was insured by a commercial general liability policy provided by Scottsdale (the "Policy").  Compl. Ex. A, Policy.  Under the Policy, Scottsdale agreed to "pay those sums that [Moonshine LLC] becomes legally obligated to pay as damages because of 'bodily injury'" where such "'bodily injury' is caused by an 'occurrence.'"  Id. at 17.[1]  The Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Id. at 31.  The Policy provides coverage of up to $1,000,000 per occurrence.  Id. at 14.

However, such coverage is subject to an Assault and Battery Sublimit ("A/B Sublimit"), pursuant to which the Policy's $1,000,000 per occurrence coverage limit does not extend to "injury" or "bodily injury" arising from:

1.  Assault and/or Battery committed by . . . [a]ny insured [or] [a]ny other person; or

2.  The failure to suppress or prevent Assault and/or Battery by any person in 1. above; or

3.  The selling, serving or furnishing of alcoholic beverages which results in Assault and/or Battery; or

4.  The negligent . . . Employment; . . . Supervision; Reporting to proper authorities, or failure to so report; or . . . Retention . . . of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by paragraphs 1. and 2. above.

---

[1] Citations to the Policy refer to the page number of the exhibit, not the page number designated on the Policy itself.

Id. at 48.  Instead, the A/B Sublimit substitutes a $25,000 per occurrence coverage limit—and a $50,000 aggregate limit—for all "damages" that Scottsdale becomes legally obligated to pay "because of 'injury,' [or] 'bodily injury' . . . to any person arising out of Assault and/or Battery."  Id. at 48, 49.

On January 20, 2015, Infinger filed suit against Moonshine LLC in the Court of Common Pleas for Berkeley County, bringing causes of action for negligence, gross negligence, and recklessness in connection with decedent's death (the "underlying action").  Underlying Compl. ¶¶ 14–22.  Pursuant to the Policy, Scottsdale is providing a defense to Moonshine LLC in the underlying suit.  Compl. ¶ 13.  However, the parties disagree as to the extent of Scottsdale's coverage obligations.  Scottsdale contends that the A/B Sublimit applies, and consequently, that Scottsdale's liability for the claims in the underlying action is limited to $25,000.  Id. ¶ 23.

Scottsdale filed the instant declaratory judgment action on March 11, 2016. Infinger file a motion for summary judgment on April 12, 2016.  ECF No. 8. Scottsdale filed a response to Infinger's motion, ECF No. 12, and filed its own motion for summary judgment on April 29, 2016.  ECF No. 11.  Infinger filed a reply in support of his initial motion on May 9, 2016, ECF No. 14, and filed a response to Scottsdale's motion on May 16, 2016.  ECF No. 20.  Scottsdale filed a reply in support of its motion on May 26, 2016.  ECF No. 21.  Both motions are now ripe for the court's review.

3

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56(c) of the Federal Rules of Civil Procedure requires that the district court enter judgment against a party who, 'after adequate time for discovery . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 190 (4th Cir. 1997) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Any reasonable inferences are to be drawn in favor of the nonmoving party. See Webster v. U.S. Dep't of Agric., 685 F.3d 411, 421 (4th Cir. 2012). However, to defeat summary judgment, the nonmoving party must identify an error of law or a genuine issue of disputed material fact. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); see also Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003).

Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence. See Anderson, 477 U.S. at 252; Stone, 105 F.3d at 191. Rather, "a party opposing a properly supported motion for summary judgment . . . must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat, 346 F.3d at 522 (quoting Fed. R. Civ. P. 56(e) (2002) (amended 2010)). If the adverse party fails to provide evidence establishing that the factfinder

4

could reasonably decide in his favor, then summary judgment shall be entered "regardless of '[a]ny proof or evidentiary requirements imposed by the substantive law.'" Id. (quoting Anderson, 477 U.S. at 248).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

### III.   DISCUSSION

The central question in this case is the applicability of the A/B Exclusion. Infinger contends that Bennett's discharge of the firearm did not constitute "assault" or "battery" within the meaning of the A/B Sublimit, because those terms require intent to harm, which Bennett could not possibly have formed.[2] Def.'s Mot. 6–7;

---

[2] Infinger also attempts to apply prior case law dealing with "intentional acts exclusions" which the South Carolina Supreme Court has described as "exclusion[s] . . . related to damages caused intentionally by or at the direction of the insured." Miller v. Fid.-Phoenix Ins. Co., 231 S.E.2d 701, 702 (S.C. 1977). The A/B Sublimit is clearly not an intentional acts exclusion because it extends to actions other than the intentional acts of the insured, including: (i) "Assault and/or Battery committed by . . . [a]ny other person[;]" (ii) "[t]he failure to suppress or prevent Assault and/or Battery by [the insured or any other person;]" (iii) "[t]he selling, serving or furnishing of alcoholic beverages which results in Assault and/or Battery[;]" and (iv) negligent employment, supervision, reporting, or retention of a person who commits or fails to suppress or prevent an Assault and/or Battery. Policy

Def.'s Resp. 5–10.  Scottsdale counters that the terms "assault" and "battery," as used in the Policy, do not require intent, and even if they do, Bennett's actions nevertheless fall within the scope of the A/B Sublimit.  Pl.'s Mot. 7–14.

"An insurance policy is a contract between the insured and the insurance company, and the terms of the policy are to be construed according to contract law." Auto Owners Ins. Co. v. Rollison, 663 S.E.2d 484, 487 (S.C. 2008).  "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." Beaufort Cty. Sch. Dist. v. United Nat. Ins. Co., 709 S.E.2d 85, 90 (S.C. Ct. App. 2011) (citing Schulmeyer v. State Farm Fire & Cas. Co., 579 S.E.2d 132, 134 (S.C. 2003)).  "If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." Id. (citing Schulmeyer, 579 S.E.2d at 134).  "However, an insurance contract which is 'in any respect ambiguous or capable of two meanings must be construed in favor of the insured.'" Id. (quoting Reynolds v. Wabash Life Ins. Co., 161 S.E.2d 168, 169 (S.C. 1968).  "The rules of contract construction require exclusionary clauses to be narrowly interpreted." Id. at 96 (citing Buddin v. Nationwide Mut. Ins. Co., 157 S.E.2d 633, 635 (S.C. 1967)).

The Policy excludes from its general coverage provisions all injuries "arising from[] . . . Assault and/or Battery" committed by third parties, or "the failure to suppress or prevent" any such "assault and/or battery."  Policy at 48 (emphasis

---

at 48.  Moreover, the Policy has a separate intentional acts exclusion dealing with "'bodily injury' . . . expected or intended from the standpoint of the insured." Id. at 18.  This provision and the case law governing intentional acts exclusions are not relevant to this action.

added).  The A/B Sublimit substitutes reduced coverage limits for all damages "<u>arising out of</u> [an] Assault and/or Battery."  <u>Id.</u> at 49 (emphasis added).  When "construing an exclusionary clause in a general liability policy, 'arising out of' should be narrowly construed as 'caused by.'"  <u>McPherson By & Through McPherson v. Michigan Mut. Ins. Co.</u>, 426 S.E.2d 770, 771 (S.C. 1993)); <u>see</u> <u>also</u> <u>Coleman v. Acceptance Indem. Ins. Co.</u>, 369 F. App'x 595, 597 (5th Cir. 2010) (finding victim's involvement in an altercation "immaterial to the applicability of the [Assault and Battery] Exclusion, which barred "coverage for '<u>any</u> claims <u>arising out of</u> Assault and Battery or out of any act or omission in connection with the prevention or suppressions of such acts") (emphasis in original).  Thus, the crucial question in determining whether the A/B Sublimit applies is whether decedent's death was "caused by" an "assault" or "battery."  Importantly, the Policy does not require the injured party to have been the target of the assault or battery.

Infinger offers two alternative explanations for why decedent's death was not "caused by" an assault or battery.  ECF No. 20 at 4–5.  Infinger first argues that when Bennett fired the shot that struck decedent, he did not possess the requisite intent to "assault" or "batter" anyone because he discharged the firearm at random into the air and the side of the Saloon.  ECF No. 8 at 6–7.  Alternatively, Infinger argues that Bennett fired the fatal shot in self-defense, attempting to dissuade an outlaw biker gang from attacking him <u>en</u> <u>masse</u>.  ECF No. 20 at 4.  The court addresses each argument in turn.

1.      **Discharging Firearm at Random**

Infinger's first theory relies on his assertion that the Policy's definition of "assault" includes an element of intent. Def.'s Mot. 6. Infinger bases this interpretation on his assertion that intent is a required element of a claim for civil assault, except where "reasonable fear of bodily harm has been caused by the conduct of the defendant." Def.'s Resp. 5 (quoting Herring v. Lawrence Warehouse Co., 72 S.E.2d 453, 458 (S.C. 1952)).

This court has recognized that "there is some support in South Carolina case law for the proposition that one may commit a civil assault unintentionally." Canopius US Ins., Inc. v. Middleton, No. 2:15-cv-3673-DCN, 2016 WL 4379538, at *7 (D.S.C. Aug. 17, 2016); see also Herring, 72 S.E.2d at 458 ("In civil actions, the intent, while pertinent and relevant, is not an essential element."); Mellen v. Lane, 659 S.E.2d 236, 244 (S.C. Ct. App. 2008) ("The elements of assault are: (1) conduct of the defendant which places the plaintiff, (2) in reasonable fear of bodily harm."). Nevertheless, in Middleton, the court rejected an insurer's attempt to define the term "assault," as used in a similar Assault and Battery Exclusion, without reference to the assailant's mental state, reasoning that doing so would render the policy's coverage illusory. Middleton, 2016 WL 4379538, at *9. However, the court need not decide whether the reasoning in Middleton extends to this case because, even if one assumes Bennett was firing at random when he shot decedent, his actions would still possess the requisite intent to fall within the more restrictive, intent-based definition of assault.

Although Bennett may not have intended to shoot anyone, any reasonable fact-finder must still conclude that he intended to place someone in "reasonable fear of bodily harm."  See Mellen v. Lane, 659 S.E.2d at 244 ("The elements of assault are: (1) conduct of the defendant which places the plaintiff, (2) in reasonable fear of bodily harm.").  The undisputed facts all indicate that Bennett fired the gun in reaction to being chased out of the Saloon following an altercation.[3]  Def.'s Mot. 2 ("An altercation broke out inside the bar, and Bennett was forced to leave.  After Bennett exited the [] Saloon and was in the parking lot, [he] discharged a firearm multiple times.").  Under the circumstances, the only reasonable inference to be drawn from such behavior is that Bennett intended to intimidate or frighten certain persons at the Saloon.[4]  Thus, under Infinger's first theory, it is clear that Bennett committed an intentional assault against someone.  Because this assault was intentional, it falls within even the most restrictive interpretation of the word "assault," and therefore, the A/B Sublimit applies.  It does not matter that the assault was not intentionally directed at decedent because the A/B Sublimit applies to all injuries "arising from" or "caused by" an assault, not just injuries to the intended victim.  Policy at 48; see also McPherson By & Through McPherson, 426 S.E.2d at 771 (reading the phrase "arising out of," as used in an exclusionary clause, to mean "caused by").  Here, where Bennett unintentionally struck decedent while firing

---

[3] Infinger does argue that Bennett's actions constituted "intervening acts" which broke the causal connection between the initial dispute inside the bar and decedent's death.  Def.'s Mot. 4.  This may be so, but nothing in the record suggests, and Infinger has not attempted to argue, that Bennett's actions were motivated by anything other than the initial dispute.

[4] It is possible that Bennett's intent was motivated by a desire to dissuade others from pursuing him.  This possibility is discussed in the following section addressing Infinger's self-defense argument.

"randomly" at the side of the Saloon, the causal link between the assault and decedent's death is immediate and direct. Therefore, the court finds that decedent's death "arose from" the assault, within the meaning of the Policy.

### 2.    Self-Defense

In his response to Scottsdale's motion for summary judgment, Infinger moves away from his prior contention that Bennett discharged the firearm "randomly," and argues instead that Bennett was actually firing in self-defense. Def.'s Resp. 2, 4, 10. Infinger claims that the initial altercation inside the Saloon involved an outlaw biker gang known as the "Misguided Brotherhood." Id. According to Infinger, the entire episode was triggered by a dispute regarding Bennett's engagement to one gang member's ex-girlfriend. Id. at 2. Infinger also suggests there was some racial element to the incident, noting that the "Misguided Brotherhood" is an all-white gang, while Bennett is black. Id. Whatever the cause of the initial altercation, Infinger claims that the Misguided Brotherhood chased Bennett from the Saloon and pursued him "with the apparent intention to harm him or worse." Id. at 10.

Even if Infinger's version of events were true,[5] the court would still be faced with injuries caused by an assault. The only difference would be that the assault was committed by the Misguided Brotherhood, not Bennett. If members of the Misguided Brotherhood did indeed chase Bennett out of the Saloon following the initial

---

[5] Bennett ultimately pleaded guilty to involuntary manslaughter and discharging a firearm into a dwelling in connection with the shooting. See ECF No. 25 (order taking judicial notice of Bennett's guilty pleas). Thus, it seems the State of South Carolina and Bennett both disagree with Infinger's version of the events. However, because the court finds that the A/B Sublimit applies, even if Infinger's account is correct, the court finds it unnecessary to determine the effect of Bennett's guilty pleas on this litigation.

altercation, then any reasonable fact-finder would be forced to conclude that the

Misguided Brotherhood engaged in conduct with the intent to either harm Bennett, or

place him in reasonable fear of bodily harm.  As discussed above, this satisfies even

the narrowest interpretation of "assault" under the A/B Sublimit.  <u>See</u> <u>Matter of</u>

<u>McGee</u>, 299 S.E.2d 334, 334 (S.C. 1983) (defining criminal assault and stating that

"if by words and conduct a person intentionally creates a reasonable apprehension of

bodily harm, it is an assault").  This theory also contemplates a direct causal nexus

between the assault and decedent's death, since actions taken in self-defense are

necessarily prompted by some form of "imminent danger"—here, the impending

attack by the Misguided Brotherhood.  <u>See</u> <u>State v. Dickey</u>, 716 S.E.2d 97, 101 (S.C.

2011) ("A person is justified in using deadly force in self-defense when . . . [he]

actually believed he was in imminent danger of losing his life or sustaining serious

bodily injury, or he actually was in such imminent danger . . . .").  Therefore, even if

the court accepts that Bennett was acting in self-defense, damages relating to the

decedent's death still fall within the scope of the A/B Sublimit.

## IV.  CONCLUSION

For the foregoing reasons, the court **DENIES** Infinger's motion for summary judgment and **GRANTS** Scottsdale's motion for summary judgment.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**January 6, 2017**
**Charleston, South Carolina**